IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |  |
|---|---|---|
| ASKAN HOLDINGS, LTD., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 20-1870C |
| | ) | Judge Hertling |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

---

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

---

## **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 6

STATEMENT OF THE CASE ......................................................................................... 6

ARGUMENT .................................................................................................................... 9

    I.      STANDARDS OF REVIEW ................................................................. 9

    II.     THIS CASE IS NOT JURISDICTIONALLY BARRED BY 28 U.S.C. § 1500 ...................................................................................... 10

    III.    ASKAN HAS STANDING TO BRING THIS CASE ......................... 14

    IV.    ASKAN PLAUSIBLY STATED A TAKINGS CASE ....................... 16

        A.    The Police Power Doctrine Does Not Apply ........................... 17

        B.    OFAC's Actions Constitute a Regulatory Taking ................... 19

CONCLUSION ............................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*767 Third Ave. Assocs. v. United States*, 30 Fed. Cl. 216 (1993)............................................. 16, 21

*A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1154 (Fed. Cir. 2014)......................... 19

*AAA Pharmacy v. United States, 112 Fed. Cl. 387 (2013)*............................................ 25

*AmeriSource Corp. v. United States*, 525 F.3d 1149 (Fed. Cir. 2008) ........................................ 18

*Apollo Fuels, Inc. v. U.S.,* 381 F.3d 1338, 1349 (Fed. Cir. 2004). ............................................... 21

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ................................................................ 10

*Atamirzayeva v. United States*, 524 F.3d 1320, 1321 (Fed. Cir. 2008) ...................................... 15

*Atlas Corp. v. U.S.,* 895 F.2d 745, 756 (Fed. Cir. 1990). ............................................................ 23

*Bass Enters. Prod. Co. v. United States*, 381 F.3d 1360, 1366 (Fed. Cir. 2004)......................... 24

*Bennis v. Michigan*, 526 U.S. 442 (1996)....................................................................... 18

*Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663 (1974)............................................ 18

*Caquelin v. United States*, 140 Fed.Cl. 564, 575 (2018). ............................................................ 24

*Cent. Pines Land Co., L.L.C. v. United States*, 697 F.3d 1360, 1364 (Fed. Cir. 2012)................ 11

*Chang v. United States*, 859 F.2d 893 (Fed. Cir. 1988)............................................................... 18

*Chichakli v. United States*, 141 Fed.Cl. 633 (2019) ................................................................... 18

*Cooke v. U.S.*, 77 Fed.Cl. 173, 176 (2007) ................................................................................ 10

*Hernandez v. U.S.*, 757 F.3d 249, 268 (5th Cir. 2014) ............................................................... 14

*Huntleigh USA Corp. v. U.S.,* 63 Fed.Cl. 440, 449 (2005). ........................................................ 21

*Int'l Paper Co. v. United States*, 282 U.S. 399 (1931). .............................................................. 20

*Johnson v. Eistentrager*, 339 U.S. 763, 776 (1950).................................................................... 14

*Kimball Laundry Co. v. U.S.*, 338 U.S. 1, 5 (1949) ................................................................... 23

*Klamath Irrigation Dist. v. United States,* 113 Fed.Cl. 688, 699 (2013)................................. 11, 12

*Klamath Irrigation v. United States*, 129 Fed.Cl. 722, 729 (2016) ............................................. 16

*Kuwait Pearls Catering Co. v. United States,* 145 Fed.Cl. 357, 366-7 (2019)............................ 15

*Lingle v. Chevron U.S.A. Inc.,* 544 U.S. 528, 538 (2005)............................................................ 16

*Paradissiotis v. United States*, 304 F.3d 1271 (Fed. Cir. 2002) ............................................. 18, 21

*Penn Cent. Transp. Co. v. New York City*, 439 U.S. 883 (1978)................................................. 19

*Petro-Hunt, L.L.C. v. United States*, 862 F.3d 1370, 1382 (Fed. Cir. 2017). ............................. 13

*Resource Investments, Inc. v. United States,* 85 Fed. Cl. 447 (2009) ......................................... 25

*Resource Invs., Inc. v. United States*, 785 F. 3d 660, 666 (Fed. Cir. 2015)................................ 13

*Rockefeller Ctr. Props. v. United States.*, 32 Fed.Cl. 586 (1995)........................................... 6, 16

*Ruckelhaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984) ........................................................... 19

*Sartori v. U.S.*, 67 Fed.Cl. 263, 268 (2005) .............................................................................. 10

*State v. United States*, 146 Fed.Cl. 693, 701 (2020) ................................................................... 10

*U.S. v. Tohono O'Odham Nation*, 563 U.S. 307, 311 (2011) ................................................ 10, 13

*United Nuclear Corp. v. United States*, 912 F.2d 1432, 1435-36 (Fed. Cir. 1990) ..................... 24

*United States v. General Motors Corp.,* 323 U.S. 373, 378 (1945)............................................. 16

*United States v. Verdugo-Urquidez*, 494 U.S. 259, 269-271 (1990) ........................................... 15

*Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury*, 750 F.Supp.2d 150 (D.D.C. 2010) ....... 18

## Statutes

50 U.S.C. § 1702(b) ...................................................................................................................... 6

50 U.S.C. § 4305 ........................................................................................................................... 6

## Other Authorities

Executive Order 13224 .................................................................................................................. 7

**Regulations**

31 C.F.R. § 594.202(c)..................................................................................................... 7

31 C.F.R. § 594.203(a)..................................................................................................... 7

31 C.F.R.§ 501.801(b)(5)................................................................................................. 6

## INTRODUCTION

Plaintiff, Askan Holdings, LLC ("Askan"), by and through counsel, brings this opposition to Defendant's Motion to Dismiss the Amended Complaint.  Plaintiff respectfully requests that the Court deny Defendant's motion as this Court has jurisdiction over this case, Plaintiff has standing to invoke the Fifth Amendment Takings Clause, and Plaintiff has properly alleged a Takings Clause violation.

## STATEMENT OF THE CASE

The description of the legal background to this case in Defendant's Motion to Dismiss the Amended Complaint is accurate.  For over 100 years the President of the United States has had the extensive ability to enact trade and economic sanctions during times of war and national emergencies.  *See* 50 U.S.C. § 4305.  These sanctions include the ability to freeze or block assets.  50 U.S.C. § 1702(b).  The Court has recognized that the International Emergency Economic Powers Act ("IEEPA"), codified as 50 U.S.C. § 1701, serves the public interest as "[t]he President's ability to deal effectively with international events is critical to the safety and prosperity of the nation."  *Rockefeller Ctr. Properties v. United States*, 32 Fed. Cl. 586, 591 (1995).  Serving the public interest albeit vital, the President must also declare a national emergency under the IEEPA, and delegated agencies must then accordingly identify threats and publicly name them.

The United States Department of Treasury, Office of Foreign Asset Control ("OFAC") has the authority to block property which it determines belongs to a Specially Designated Global Terrorist ("SDGT") or in which an SDGT has an interest.  To lift the block on specific property, an entity must apply to OFAC for a specific license.  Pursuant to 31 C.F.R. § 501.801(b)(5), if

OFAC denies a specific license, the applicant may request a "reconsideration of the denial of an application on the basis of new facts or changed circumstances."

In February 2016, after Askan requested the return of a down payment from escrow in Switzerland after a failed business deal, OFAC instructed Deutsche Bank Trust Company Americas ("Deutsche Bank Americas") to block the return of the $915,960.06. Pursuant to 31 C.F.R. § 594.203(a), Deutsche Bank Americas was *required by law* as enforced by OFAC to place Askan's funds in a blocked United States bank account and continue to block the return of the funds to Askan. By remaining in a blocked account, Askan lost all access and control of the funds. Further, Deutsche Bank Americas was prohibited from transmitting the funds to anyone, including Askan, without a specific license to do so from OFAC. *See* 31 C.F.R. § 594.202(c). Upon learning of the block, Askan began applying for a specific license to retrieve its funds. After three license applications, OFAC finally granted a specific license to Askan for the funds on August 17, 2020, after Askan had commenced litigation against OFAC in the District Court for the District of Columbia (the "District Court Lawsuit"). Now that the license has been issued, OFAC is moving for the district court to dismiss the suit as moot, arguing that there is no need to address the alleged Freedom of Information Act ("FOIA") and due process violations now that Askan has its funds.

The purpose of OFAC blocking funds under the Global Terrorism Sanctions Regulations, 31 CFR Part 594 (the "GTSR"), is to prevent SDGTs, as determined by the Federal Government and published in the Federal Register, from accessing property and thereby allowing the U.S. Government to exert leverage on terrorist organizations. *See* Exec. Order 13224, 3 C.F.R. § 13224 (2002). As such, any blocked property must be associated with an SDGT; and there is no bifurcation of assets that may aid in terrorist activities. Rather, the Executive Order calls on

blocking *any* assets in which SDGTs have an interest upon entry into the United States or are in the possession of a United States person.  The Executive Order allows for a general block on all assets regardless of the property's actual tie to aiding terrorism.  Askan is not, nor has ever been, involved with or associated with any individual, entity, or country targeted by United States economic and trade sanctions.  In fact, OFAC has never specifically stated who the alleged SDGT is which led to the blocking of Askan's funds.[1]

OFAC's own actions initially prevented Askan from retrieving its funds even after receiving the specific license.  This is because in November 2019, while Askan's third license application was pending and Askan's counsel was in routine communication with OFAC concerning such and being fully aware that Askan's property was not in fact abandoned, OFAC issued a license to the New York State Office of the Comptroller (the "Comptroller") to escheat Askan's funds under New York's Abandoned Property Laws thereby falsely and purposefully declaring the property abandoned.  Simultaneously, OFAC issued a license to Deutsche Bank Americas for the transfer of the funds to New York State for the escheatment. This caused further delay, harm, and expense for Askan to rightfully attain the return of Askan's property. Even though the Comptroller had actual possession of the property, it was OFAC who continued to exercise control over the funds as it was not until March 2021, that Askan finally received its funds at the behest of OFAC upon issuing a license to the Comptroller to return the funds to Askan as a result of litigation in the District Court.

---

[1] To date, OFAC has still not disclosed the identity of any SDGT with an alleged interest in Askan's funds even though the identities of OFAC-designated persons and entities are mandated public record and are required to be published in the Federal Register. In the District Court Lawsuit, the administrative record received by Askan from OFAC still did not name any SDN and redacted large swaths of unclassified information, including its communications with Deutsche Bank for no stated purpose.

On February 10, 2021, counsel sent a Freedom of Information Law (FOIL) records request to the Comptroller for the names of persons and entities whose blocked accounts were escheated to New York with a license from OFAC in the last five years. On May 28, 2021, counsel received the list of names. The list includes 4,219 names indicating that OFAC regularly permits the escheatment of blocked accounts to New York State.  Prior to receiving this list Askan's counsel was told by the Comptroller's office that the number of escheatments of funds blocked by OFAC was roughly 10 per year, not 1,000 or more.  Askan was never notified of the escheatment or the possibly of an escheatment of its funds by OFAC to the New York State Comptroller, and only discovered such as a result of litigation in district court.  OFAC was actively reviewing Askan's third license application for return of its funds when it issued a separate license to each Deutsche Bank and the Comptroller to transfer and receive Askan's blocked funds and thereby independently deeming Askan's funds abandoned.

By ordering Deutsche Bank Americas to block Askan's refund, OFAC exercised dominion and control over Askan's private property.  Deutsche Bank Americas was simply the custodian of Askan's funds while OFAC controlled how the funds were handled.  This deprived Askan of its property for public use without just compensation, violating the Fifth Amendment's Takings Clause.

**ARGUMENT**

## I.      STANDARDS OF REVIEW

In a motion to dismiss for lack of subject matter jurisdiction, "[p]laintiffs bear the burden of proving by a preponderance of the evidence that the Court possesses subject-matter jurisdiction.  If the court determines that it lacks subject-matter jurisdiction over a claim, the claim must be dismissed."  *Pellegrini v. United States*, 103 Fed. Cl. 47, 50 (2012) (citations

9

omitted).  During this analysis, "the Court must assume the truth of the complaint's factual allegations, construing the facts and drawing all reasonable inferences in the plaintiff's favor." *Cooke v. United States*, 77 Fed.Cl. 173, 176 (2007).  Additionally, "[t]he court may consider all relevant evidence, including evidentiary matters outside the pleadings, when resolving a jurisdictional challenge."  *Sartori v. United States*, 67 Fed. Cl. 263, 268 (2005).

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, a complaint must state a claim which is facially plausible.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  The complaint must be read liberally and "[d]ue to the fact-intensive nature of takings cases, discovery is often 'necessary to determine whether plaintiffs' allegations demonstrate a taking, and therefore, plaintiffs should be given the opportunity to develop facts in support of their claims.'"  *State v. United States*, 146 Fed. Cl. 693, 701 (2020) (quoting *Orr v. United States*, 145 Fed. Cl. 140, 158 (2019)).

## II.     THIS CASE IS NOT JURISDICTIONALLY BARRED BY 28 U.S.C. § 1500

28 U.S.C. § 1500 prohibits a plaintiff from bringing duplicative cases in Federal Claims Court and any other court.  "The C[ourt of] F[ederal] C[laims]  has no jurisdiction over a claim if the plaintiff has another suit for or in respect to that claim pending against the United States or its agents."  *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 311 (2011).  Claims for or with respect to a pending claim are considered one and the same for purposes of § 1500 if they are "based on substantially the same operative facts."  *Pellegrini*, 103 Fed. Cl. at 50. (citation omitted).

Section 1500's "jurisdictional bar attaches, if at all, at filing." *Cent. Pines Land Co.*, 697 F.3d at 1364. The purpose of the amended complaint was not to solve alleged subject-matter jurisdiction deficiencies. Rather, the amended complaint was filed to remedy deficiencies under Rule 12(b)(6) for not sufficiently stating a claim for relief under the Takings Clause. Applying this analysis to the original complaint filed, this Court still retains subject-matter jurisdiction as the Amended Complaint merely amends the presentation of the claims, not the operative facts.

The § 1500 inquiry begins when the complaint is filed in Federal Claims Court and "cannot be rescued by subsequent action of either party or by resolution of the co-pending litigation." *Id.* at 1367. Further, "[t]o determine whether the § 1500 bar attached when the plaintiffs filed their Claims Court action, we compare the operative facts asserted at the time the two complaints were filed." *Id.* at 1364. This analysis "requires more than a side-by-side comparison of the two complaints to see how much verbiage is in common. . . . [R]ather, the court must first isolate the facts in the complaints that are operative. This requires the court to distinguish between operative facts and what some courts have termed background facts." *Klamath Irrigation Dist. v. United States,* 113 Fed. Cl. 688, 699 (2013).

It is undisputed that Askan has a pending case in the District Court for the District of Columbia. However, the mere existence of a pending case is insufficient to bar jurisdiction. The allegation that the two actions concern the same claims is not met in this case. The jurisdictional question in this case hinges on whether Plaintiff's takings claim in this court is the same as for or in respect to the claims alleged in the District Court Lawsuit.

This Court developed four questions to determine if two claims are the same requiring preclusion under § 1500. Specifically, these are:

(i) Are the issues of fact and law raised by the two claims largely the same? (ii) If an adverse merits decision were rendered on the earlier claim, would the doctrine of *res judicata* bar a subsequent suit on the later-filed claim? (iii) Will the plaintiff rely on substantially the same evidence to support each of the two claims? (iv) Is there any other logical relationship between the two claims?

*Klamath Irrigation Dist.,* 113 Fed. Cl. at 708.  An affirmative response to any of the questions bars the Federal Claims suit under § 1500.

Applying the inquiry from *Klamath*, the Court retains subject-matter jurisdiction over this suit.  The takings claim alleged in this Court and the claims alleged in the District Court Lawsuit are not largely the same.  The only overlap between the suits are of background facts, not of operative facts.  In the District Court Lawsuit, the issues of concern are OFAC's internal decision making regarding the blocking itself and the subsequent escheatment to New York.  Those two issues are not at play in this suit.  In the takings claim, the issue is whether the delay in the return of funds was so extraordinary as to render a temporary taking and to determine the extent of the economic harm suffered by Askan.

Plaintiff will not rely on substantially the same evidence to support the claims in the District Court Lawsuit and this lawsuit.  The District Court Lawsuit will hinge upon the administrative record developed by OFAC.  In this case, the evidence will center on the delay in return and the costs incurred by Askan due to OFAC's taking.  The evidence for the District Court Lawsuit will be insufficient for this action as it will be limited to the administrative record and other Administrative Procedure Act guidelines.  The evidence in this suit will extend beyond the administrative record.

In *Resource Investments* the Federal Circuit Court applied the *res judicata* transaction test to determine if the claims filed in the Federal Claims Court were barred by § 1500 due to pending litigation in a district court case.  The court, following the Supreme Court decision in

*United States v. Tohono O'Odham Nation*, began its analysis with "whether the second Claims Court takings suit would have been barred by res judicata if it had been brought in a district court." *Resource Investments, Inc. v. United States*, 785 F. 3d 660, 666 (Fed. Cir. 2015).  Using the transaction test, wherein all legitimate claims relating to the same transaction must be brought together to avoid preclusion, the court found that since both suits arose from the same conduct - a permit denial - the suits had the same operative facts and therefore the Federal Claims Court did not have subject-matter jurisdiction.  The court determined that "the two actions relate to the same underlying transaction and § 1500 bars the Claims Court action here." *Id.* at 668.  Additionally, the Court pointed out that the plaintiff is unable to save a deficient complaint from § 1500's jurisdictional bar by filing an amended complaint.

In *Tohono*, the Supreme Court held that the jurisdictional bar applied because the plaintiff alleged the government held the same assets in trust and the same breaches of fiduciary duty in district court and in the Court of Federal Claims. *Tohono*, 563 U.S. at 318.  Similarly, in *Petro-Hunt*, the Federal Circuit upheld the Federal Claims Court's dismissal under § 1500 because the plaintiff's district court and Federal Claims suits centered on the same mineral servitudes, the same history of land conveyances, the same history of mineral rights conveyances, and the same wrongful land use by the government. *Petro-Hunt, LLC v. United States*, 862 F.3d 1370, 1382 (Fed. Cir. 2017).

Askan's case is different from the above referenced cases. *Resource Investments* involved two cases in which the allegations arose from the same transaction.  This is not the case here.  While Defendant argues that both the Federal Claims suit and the District Court Lawsuit arise from the same transaction – the blocking – this is too broad.  The Federal Claims suit does arise and focus on OFAC's blocking of Askan's funds.  However, the District Court Lawsuit

arises from OFAC's conduct after the blocking which only came to light after litigation commenced in the District Court.  These are two different transactions and courses of conduct on the part of OFAC.  There is OFAC blocking Askan's funds (the Federal Claims case) and OFAC obstructing information regarding the license denials and the escheatment as alleged in the District Court Lawsuit.  While OFAC's conduct regarding the license denials and escheatment relates to the blocking, it differs in that the conduct alleged in the District Court Lawsuit is ongoing whereas the Federal Claims lawsuit involves a transaction which has ceased.

Further, Askan's lawsuits in the District Court of the District of Columbia and in this Court are unlike those in *Tohono* and *Petro-Hunt*.  The District Court Lawsuit and this lawsuit merely share background facts but turn on different operative facts.  The District Court Lawsuit alleging FOIA and due process violations hinges on OFAC's lack of transparency in dealing with the block of Askan's funds and the Comptroller escheatment.  More specifically, it focuses on OFAC's withholding of the identity of the alleged SDGT causing the blocking and the subsequent escheatment.  Conversely, this lawsuit is centered on OFAC blocking Askan's refund and subsequently maintaining it in bad faith.  This case has different operative facts than those in the District Court Lawsuit.  The overlap in the facts is not enough to warrant a jurisdictional bar. The *res judicata* transaction test does not preclude this action.

## III.    ASKAN HAS STANDING TO BRING THIS CASE

While the text of the Fifth Amendment "does not limit the category of individuals entitled to protection," *Hernandez v. United States*, 757 F.3d 249, 268 (5th Cir. 2014), case law limits the Amendment's protection based upon citizenship and location.  *See e.g. Johnson v. Eisentrager*, 339 U.S. 763, 776 (1950) (finding that plaintiffs lacked Fifth Amendment due process rights as enemy aliens abroad with no contacts with the United States); *United States v. Verdugo-*

*Urquidez*, 494 U.S. 259, 269-271 (1990) (finding that *Eistentrager*'s holding extends to prohibiting Fourth Amendment protection for the foreign property of noncitizen, nonresident criminal defendants facing trial in the United States). In this case, Plaintiff is not an "enemy alien" and is not seeking Fourth Amendment protection. Rather, Plaintiff is a civilian corporation attempting to engage in international business with the United States.

A nonresident, foreign plaintiff must establish substantial, voluntary contacts with the United States to have Fifth Amendment standing. *Kuwait Pearls Catering Co. v. United States,* 145 Fed. Cl. 357, 366-7 (2019). Askan has Fifth Amendment standing as the property at issue was taken in the United States and came into the territory of the United States by Askan voluntarily. Askan has voluntary contacts with the United States as the company entered into a business deal with an American company. That deal fell through and Askan requested its U.S. dollar-denominated down payment returned to it from escrow in Switzerland. As the funds were in U.S. dollars their return required clearing in the United States, specifically New York City via Deutsche Bank Americas.

Askan has more contacts with the United States than the plaintiff in *Atamirzayeva v. United States*. In that case, the plaintiff was a citizen of Uzbekistan alleging that the United States ordered Uzbek officials to destroy her cafeteria. *Atamirzayeva v. United States*, 524 F.3d 1320, 1321 (Fed. Cir. 2008). The plaintiff had no other connection with the United States aside from this allegation. *Id.* at 1322. As demonstrated above, this is clearly not the case for Askan. Askan's funds came under OFAC's jurisdiction and regulation because Askan voluntarily did business with an American company using United States currency.

IV.     **ASKAN PLAUSIBLY STATED A TAKINGS CASE**

The Fifth Amendment of the U.S. Constitution protects against government appropriation of private property for public use without just compensation.  The traditional idea of a taking is the government's use of eminent domain to take private real property for public use.  However, takings have a broader scope as "[g]overnmental action short of acquisition title or occupancy has been held, if its effects are so complete as to deprive the owner of all or most of his interest in the subject matter, to amount to a taking."  *United States v. General Motors Corp.,* 323 U.S. 373, 378 (1945). Takings may occur through regulations rather than direct physical appropriation. "It is not essential for the government to actually physically appropriate the property for its use for a taking to occur.  A taking may also occur when the government by its actions deprives an owner of all or most of its compensable interest in the property."  *767 Third Ave. Assocs. v. United States*, 30 Fed. Cl. 216, 219 (1993).  Additionally, a *per se* taking is "government action which effects a physical invasion of private property or which amounts to a permanent occupation thereof."  *Rockefeller Ctr. Props. v. United States*, 32 Fed. Cl. 586, 590 (1995).  Further, a regulatory action which "deprives an owner of *all* economically beneficial use of her property" is also a *per se* taking.  *Lingle v. Chevron U.S.A. Inc.,* 544 U.S. 528, 538 (2005) (citation omitted) (emphasis in original).  To determine whether a government action is a regulatory taking, the court must first determine "whether a plaintiff possesses a cognizable property interest in the subject of the alleged takings.  Then, the court must determine whether the government action is a compensable taking of that property interest."  *Klamath Irrigation v. United States*, 129 Fed. Cl. 722, 729 (2016).

In this case, the United States required Askan to suffer a physical invasion of its property by blocking its funds so that Askan had no access to the money and continuing to deny license

applications to unblock those funds.  Clearly, Askan has a cognizable property interest in the refund as OFAC has recognized by issuing the specific license to Askan and also to the Comptroller to return and release Askan's funds. Further, OFAC's regulations recognize Askan's blocked funds as property.  31 C.F.R. § 594.309 (defining "property" and "property interests").

OFAC's regulations allowing the blocking of Askan's funds deprived Askan of all economically beneficial use of its property for over four years without clear recourse as to how to end the blocking or attain just compensation.  From February 2016 until March 2021, Askan was unable to access its funds, and as such, was unable to use the money to invest in its company which was the economic purpose of that money.  During this time, and continuing to this day, OFAC never identified the interested SDGT so that even if it were to be removed from OFAC's list of Specially Designated Nationals and Blocked Persons (the "SDN List"), Askan would have no reason to know and therefore would not be in a position to reapply for a license to unblock the funds.  Further, Askan would not even know what conduct to terminate or avoid going forward to prevent a repeat situation that could lead to similar blocking in the future.  Instead, the funds sat under the government's dominion and control while Askan was left spinning its wheels trying to find a way to get its funds unblocked and to attempt to discover why its funds were blocked in the first place.  The United States committed a categorical taking, or in the alternative committed a regulatory taking.  Additionally, the police power doctrine asserted by Defendant does not apply in this case.

### A.   The Police Power Doctrine Does Not Apply

The police power exception to a taking does not apply in this case.  The cases cited by Defendant are not analogous to the fact pattern here.  Defendant's use of cases cited in support of the police power doctrine involve plaintiffs who were either actively involved in a criminal case,

owned property that was an instrumentality of a crime, or were either listed as or had a known

association with an SDN.  *See Bennis v. Michigan*, 526 U.S. 442 (1996) (plaintiff alleged a

taking of a vehicle which was forfeited as an instrumentality of a crime); *Calero-Toledo v.

Pearson Yacht Leasing Co.*, 416 U.S. 663 (1974) (plaintiff alleged a taking of a yacht which was

forfeited as an instrumentality of a crime); *AmeriSource Corp. v. United States*, 525 F.3d 1149

(Fed. Cir. 2008) (wholesale pharmaceutical distributor's drugs seized as part of an ongoing

criminal proceeding); *Paradissiotis v. United States*, 304 F.3d 1271 (Fed. Cir. 2002) (plaintiff

knowingly worked for a sanctioned, Libyan-controlled corporation);  *Chang v. United States*,

859 F.2d 893 (Fed. Cir. 1988) (plaintiffs lost contracts with a sanctioned Libyan-controlled oil

corporation);  *Chichakli v. United States*, 141 Fed. Cl. 633 (2019) (plaintiff designated as an

SDN prior to having assets blocked by OFAC); *Zarmach Oil Servs., Inc. v. U.S. Dep't of the

Treasury*, 750 F.Supp.2d 150 (D.D.C. 2010) (plaintiff knowingly engaged in contract with

sanctioned Sudanese oil corporation).  None of these scenarios relate to the present facts.

The police power doctrine does not apply in this case.  Askan has never been an SDGT

and at the time of the business deal with the American company, Askan was not in business with

nor had any relationship with any SDGT.  This case is a matter of first impression.  The case law

regarding OFAC and the Takings Clause all involve plaintiffs who were either designated by

OFAC or knowingly associated with a designated person or entity.  Furthermore, in the case law

regarding criminal forfeitures and takings, the plaintiffs knew they had a property interest in an

instrumentality of a crime, and even if the plaintiffs themselves did not commit the crime, they at

least had knowledge as to why the property was forfeited as the property was clearly related to a

known criminal act or investigation.  In Askan's case, OFAC never disclosed the identity of any

alleged SDN with any interest in Askan's funds, nor has declared any involvement by or with an

SDN. The police power doctrine does not allow the U.S. Government to act without limitations. In the police power jurisprudence, the government had identifiable, specific purposes when taking property. Such identifiable and specific purpose is absent here.

**B.  OFAC's Actions Constitute a Regulatory Taking**

To determine if a regulatory taking occurred, the Court must apply the *Penn Central* factors and examine "the character of the governmental action, its economic impact, and its interference with investment-backed expectation." *Ruckelhaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984) (quoting *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 83 (1980)); see also *Penn Cent. Transp. Co. v. New York City*, 439 U.S. 883 (1978).

**1.      Character of the Government Action**

The government's action was clear and direct. Deutsche Bank Americas did not block Askan's funds on its own volition, but was rather required to act as OFAC's *de facto* agent in blocking and keeping the funds and upon OFAC's direction and regulations to abide by such.  To escheat the funds to the Office of the New York State Comptroller, OFAC's authorization by specific license issued to the bank was required for the bank to transfer the funds to the Comptroller, and by specific license issued OFAC to the Comptroller to receive the funds from the bank. While Defendant may wish to escape liability by claiming that the funds were never in its possession, "the government may be liable if the third party is acting as the government's agent or the government's influence over the third party was coercive rather than merely persuasive." *A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1154 (Fed. Cir. 2014).

In *International Paper Co.*, the Secretary of War ordered the Niagara Falls Power Company, which owned the rights to a canal to generate power and which it leased part of those rights to International Paper for its mill, to stop allowing International Paper to use any of the

water, and to send all available power output from the canal to the U.S. government for use in the war efforts of World War I. *Int'l Paper Co. v. United States*, 282 U.S. 399, 404-05 (1931). The Supreme Court found that the United States owed International Paper just compensation for the taking of its water, even though the government had requisitioned the power output of that water from Niagara Falls Power Company. "[International Paper's] right was to the use of the water; and when all the water that it used was withdrawn from [its] mill and turned elsewhere by government requisition for the production of power it is hard to see what more the Government could do take the use." *Id.* at 407. Similarly, the Government in this case directed Askan's funds elsewhere and took the use of Askan's property.

Deutsche Bank Americas did not block the funds at OFAC's persuasion, but rather at OFAC's direction and pursuant to its regulations. The bank was OFAC's agent in enforcing the agency's policies and was required to act on OFAC's behalf so that the government could fulfill its interest in taking Askan's property.  This is the core of OFAC's blocking policy – the agency's regulations outsource the blocking and custodial functions to the U.S. persons coming into contact with assets in which SDGTs have an interest. As many of these blockings are of liquid funds, this task often falls on financial institutions like Deutsche Bank Americas, who are also subject to OFAC's regulations.

### 2.      Reasonable Investment-Backed Expectations

The government interfered with Askan's reasonable investment-backed expectations that its funds would not be blocked. There are three factors to consider when determining reasonable investment-backed expectations: 1) if the plaintiff is engaged in a highly regulated industry; 2) if the plaintiff was aware of the issue triggering the regulation; and 3) if the plaintiff could

reasonably anticipate the regulation based on the nature of the regulatory environment. *See*

*Apollo Fuels, Inc. v. United States,* 381 F.3d 1338, 1349 (Fed. Cir. 2004).

International commerce is a highly regulated industry. However, "mere participation in a

heavily regulated industry does not preclude a plaintiff from ever prevailing on a takings claim."

*Huntleigh USA Corp. v. United States,* 63 Fed. Cl. 440, 449 (2005). Knowing that international

commerce is highly regulated, Askan performed due diligence and reasonably believed that no

SDGT was involved in its business dealings for the aircraft. While this Court has stated that

"[w]hen dealing in foreign commerce, the possibility of changing world circumstances and a

corresponding response by the United States government can never be completely discounted,"

*767 Third Ave.,* 30 Fed. Cl. at 221, Askan took reasonable steps to comply with U.S. law in its

international dealings. Unlike the plaintiff in *767 Third Ave.,* Askan is not sophisticated as to

know or anticipate an impending OFAC block. Askan made reasonable due diligence prior to

the aircraft purchase from the American corporation, and reasonably believed that no one on the

SDN List was involved in its transaction. Thus, under the second factor, Askan did not know

about the problem triggering the application of the blocking. Askan reasonably believed that it

was safe from economic sanctions.

In *Paradissiotis v. U.S.*, the Court determined that the plaintiff had no reasonable

expectation of government non-interference as he had dealt with the Libyan government before

he was designated an SDN and was aware of the problematic relations between Libya and the

United States. 49 Fed. Cl. at 22. Askan had no such reasonable expectation that its funds may be

subject to economic sanctions by the United States. Askan was not dealing with a sanctioned

country, entity, or person, and conducted due diligence before commencing the aircraft deal. As

such, Askan had a reasonable expectation of noninterference by the government.

### 3.  Economic Impact

The economic impact inflicted upon Askan by the government's actions is significant and more than consequential.  As alleged in the amended complaint, TIA, the owner of Askan, was bankrupted and lost significant business due to the blocking.  "The value compensable under the Fifth Amendment . . . is only that value which is capable of transfer from owner to owner and thus of exchange for some equivalent." *Kimball Laundry Co. v. United States*, 338 U.S. 1, 5 (1949).  In *Kimball Laundry Co.*, the Supreme Court held that in evaluating just compensation, the court must consider the value of lost business - "an exercise of the power of eminent domain which has the inevitable effect of depriving the owner of the going-concern value of his business is a compensable 'taking' of property.  If such a deprivation has occurred, the going-concern value of the business is at the Government's disposal whether or not it chooses to avail itself of it." *Id.* at 13.  In this instance, the substantial loss is very clear.

Defendant cites to *Atlas Corp.* to support the rule that a takings claim requires a showing of economic impact.  However, the use of that case is not relevant to Askan's case.  Askan's economic harm from the blocking is more than being required to pay money. In *Atlas Corp.*, the plaintiff alleged that the government requiring it to spend money in relation to its business was a taking.  895 F.2d 745, 756 (Fed. Cir. 1990). The Federal Circuit rightly held that requiring the expenditure of money is not a taking.  *Id.*  That fact pattern is not present anywhere in this case.  Askan's economic impact is greater than merely spending money to comply with government regulation.  OFAC's blocking caused substantial lost business for Askan.

In *United Nuclear Corp.*, the Federal Circuit Court considered both the plaintiff's lost expenditures and likely significant profits in United Nuclear's takings case. United Nuclear entered a lease with Navajo Nation to mine on the reservation, and the United States Secretary of

the Interior approved the lease. Under the appropriate regulations, approval of mining plans was only required by the Secretary of the Interior. However, the Secretary of the Interior changed this and required that the mining plans be approved by Navajo Nation – giving the Nation veto power over whether or not United Nuclear could actually mine the land. 912 F.2d 1432, 1435-36 (Fed. Cir. 1990). It is appropriate for the Court to consider Askan's lost expenditures and likely profits if the funds had not been blocked when assessing the economic impact suffered by Askan.  The funds at issue were being used for investment into Askan's business, and when those funds were blocked by OFAC, Askan lost not only the money but also the business opportunities it demonstrably anticipated using those funds towards.

### 4.    Extraordinary Delay

There is no bright line rule as to how long the government must deprive a person of their property for the deprivation to constitute a taking.  *Bass Enters. Prod. Co. v. United States*, 381 F.3d 1360, 1366 (Fed. Cir. 2004). In this case, Askan was deprived of its property for over four years.

OFAC's regulations do not dictate a time period in which license decisions must be issued. This court has noted that "indefiniteness means permanency" in cases of permanent, non-categorical physical takings. *Caquelin v. United States*, 140 Fed. Cl. 564, 575 (2018). In Askan's case, OFAC took the company's funds and deprived it of any economical use for an indeterminate length of time.  The licensing process creates the ability of requesting an unblocking, but there is no time frame around the licensing process.

It is rare for the Court to find an extraordinary delay absent bad faith.  *Bass Enters. Prod. Co.* at 1366.  What qualifies as extraordinary delay is not so much  about  the length of time  to reach a decision, "but rather, the reasons for delay and the nature of the permitting process."

*Resource Investments, Inc. v. United States,* 85 Fed. Cl. 447, 489 (2009). An inquiry into the reasons for delay is necessary to determine the existence of bad faith. Without a specific definition of bad faith in the context of takings, in *AAA Pharmacy*, this court found a triable issue of fact regarding bad faith when the plaintiff alleged a government analyst refused to correct incorrect findings that the plaintiff was noncompliant with Medicare standards even though a separate report had found it compliant. 112 Fed. Cl. 387, 395 (2013). Bad faith on the part of Defendant is evident as: 1) OFAC has to this day failed to disclose the identity of the alleged SDGT triggering the block; 2) a two-year long investigation by Askan to determine if any SDGT was involved in its transaction found nothing even though OFAC claimed an SDGT had an interest in the transaction; 3) while in communication with Plaintiff's counsel about the blocked funds, OFAC enabled the funds to be escheated to New York State despite the active license review and knowing that the funds were not abandoned; and 4) OFAC granted the license for Askan to retrieve its funds even though there were no substantive or factual changes to Askan's situation following the denial of two prior license applications by Askan to OFAC to return its funds; the only change being the filing of the district court litigation for injunction to order OFAC to issue a decision on Askan's third pending license application after much delay.

The delay in this case was undue. Unlike the facts in *Bass* where the delay was deemed appropriate as the permit decision required input from three government agencies and would be issued under a new program for which the EPA had yet to publish a rule, in this case, OFAC alone determined the decision to issue a license. In the case of the first license denial, the decision should have been much faster as the agency ostensibly had a reason for the blocking. Subsequent decisions regarding licensing should have been swift since no facts or circumstances surrounding the blocked funds changed on the part of Askan. The government extended the

24

length of the blocking by refusing to provide the name of the SDGT whose alleged involvement in the transaction warranted the block, although such information should be public.  Such information would have allowed Askan to determine how to take affirmative steps in bolstering due diligence and general compliance protocol to avoid such party or parties in future business dealings and to apply for a new license with more insight as to why the funds were blocked, arguably granting a greater chance of such license being granted.  OFAC affirmatively refused to do such.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Defendant's Motion to Dismiss the Amended Complaint.

Respectfully submitted,

s/Teresa N. Taylor
Teresa N. Taylor
(Attorney of Record)
Lindsey Dennis
(*pro hac vice*)
Butzel Long, P.C.
1909 K Street N.W., Suite 500
Washington, D.C. 20006
Tel: (202) 454-2800
Fax: (202) 454-2805
taylortn@butzel.com
dennisl@butzel.com

*Counsel to Plaintiff*

June 11, 2021